# EXHIBIT A

EXHIBIT "A"

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

Claims Holding Group, LLC a/a/o
Marilyn Ankers,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant

_____/

CASE NO. 2022-047113-SP-25

FLA. BAR NO.: 121673

## SECOND AMENDED STATEMENT OF CLAIM

Plaintiff, through its undersigned counsel, hereby files this Second Amended Statement of Claim in support of its claim against Defendant, AT&T, Mobility, LLC ("AT&T MOBILITY, LLC"), and further alleges as follows:

1. This is an action against AT&T for damages for $8,000, exclusive of interest, attorney's fees, and costs.

2. Plaintiff is the assignee of a customer of AT&T, a Florida consumer, Marilyn Ankers, with cell number xxx-xx1-3146.  Ms. Ankers assigned any and all claims against AT&T to Plaintiff prior to the filing of this lawsuit.

3. AT&T MOBILITY, LLC is a foreign limited liability company licensed and doing business in Miami-Dade County, Florida subject to the general and specific jurisdiction of this Court.

4. Venue is proper in Miami-Dade County, Florida and this claim is not preempted by any Federal law.

5. Plaintiff and its assignor have complied with all conditions precedent to filing this action. Plaintiff is the title holder to any claim against AT&T

MOBILITY, LLC that Ms. Ankers has an interest in the subject matter of this claim.

6. According to court filings made by AT&T MOBILITY, LLC in federal court, it is a nongovernmental limited liability company that has no parent company but its members are BellSouth Mobile Data, Inc.; SBC Long Distance, LLC; and SBC Tower Holdings LLC. Those entities (and thus AT&T MOBILITY, LLC) are all indirectly wholly owned by AT&T Inc., which is the only publicly held company with a 10 percent or greater ownership stake in them.

7. AT&T, Inc. reports its consolidated business results, and breaks out selected disclosures for its major operating segments. Their segments are strategic business units that offer different products and services over various technology platforms and/or in different geographies that are managed accordingly. They analyze the operating segments based on segment contribution, which consists of operating income, excluding acquisition-related costs and other significant items, and equity in net income (loss) of affiliates for investments managed within each operating segment.

8. There are four reportable segments of AT&T, Inc.: (1) Communications, (2) Warner Media, (3) Latin America and (4) Xandr. AT&T MOBILITY, LLC is a major retailer of smartphones and provider of wireless broadband internet access service for smartphones.

9. Smartphone owners use mobile data for, including but not limited to, sending and receiving email, using GPS navigation, watching and streaming video, and browsing the internet. AT&T MOBILITY, LLC is a major retailer of smartphones and provider of wireless broadband internet access service for smartphones ("mobile data"). Smartphone owners use mobile data for, including but not limited to, sending and receiving email, using GPS

navigation, watching and streaming video, and browsing the internet.

10. AT&T MOBILITY, LLC's place in AT&T Inc corporate structure can be identified as follows:



11. The Communications segment provides wireless and wireline telecom, video and broadband services to consumers located in the U.S. or in U.S. territories and businesses globally. Communications services and products are marketed under the AT&T, Cricket, AT&T PREPAID and DIRECTV brand names. The Communications segment provided approximately 84% of 2018 segment operating revenues and 84% of our 2018 total segment contribution. This segment contains the Mobility, Entertainment Group and Business Wireline business units.

12. Within Communications is the Mobility business unit that provides nationwide wireless services to consumers and wholesale and resale wireless subscribers located in the United States or U.S. territories by utilizing our network to provide voice and data services, including high-speed internet over wireless devices. They classify subscribers as either postpaid, prepaid, connected device or reseller. As of December 31, 2018, they served 153 million Mobility subscribers, including 77 million postpaid, 17 million prepaid, 8 million reseller and 51 million connected devices. Their Mobility business unit revenue includes (2) reported categories: Wireless Services, and Equipment.

13. AT&T MOBILITY, LLC offers a range of nationwide wireless voice and data communications services in a variety of pricing plans to meet the communications needs of targeted customer categories. Their wireless services also include advertising revenues generated from the subscriber relationships.  They offer plans that include unlimited features allowing for the sharing of voice, text and data across multiple devices, which attracts subscribers from other providers and minimize subscriber churn.

14. AT&T MOBILITY, LLC sells a wide variety of handsets, wirelessly enabled computers (e.g., tablets and notebooks) and wireless data cards manufactured by various suppliers for use with our voice and data services. They also sell accessories, such as carrying cases and hands-free devices. They sell through their own company-owned stores, agents and third-party retail stores.

15. AT&T MOBILITY, LLC is a sophisticated company. It knew it needed to invest in enough capacity to deliver service for subscribers who used a lot of data under their unlimited plans, especially since the company had claimed its network was the "fastest" in the

nation. AT&T MOBILITY, LLC has stated that it charges the administrative fee because it is a "standard administrative fee" across the wireless industry. However, in 2017, T-Mobile eliminated the "administrative charges". Moreover, prepaid carriers like MetroPCS and AT&T's subsidiary Cricket Wireless *do not charge administrative fees.*

16.     The Administrative Fee is not properly disclosed to customers including Plaintiffs' assignor before or when they sign up, and in fact it is never adequately and honestly disclosed. The so-called Administrative Fee is not, in fact, a bona fide administrative fee, but rather is simply a means for AT&T MOBILITY, LLC to charge more per month for the service itself without having to advertise the higher prices as a scheme to increase revenue. AT&T Mobility, LLC's previous in court public admissions (filed by its corporate counsel, Patricia Cruz, Esq.) to the conduct alleged in this case (data throttling) via its filing of its "consent to payment for conduct for the claims asserted or which could have been asserted" in the cases of Erin Young v. AT&T Mobility, LLC, Case No. 2019-2027- SP-26, EFiling#87601121 or Tamara Crespo v. AT&T Mobility, LLC, Case No. 2019- 2026-SP26, E-Filing#87600869 both of which alleged AT&T's violation of FDUTPA for illegal data throttling and bogus administrative fee, is further evidence of AT&T Mobility, LLC's illegal, immoral and unethical conduct.

17. AT&T MOBILITY, LLC engaged in a deceptive scheme by suggesting that the Administrative Fee is tied to certain costs associated with AT&T MOBILITY, LLC providing wireless telephone services (interconnect charges and cell site rental charges). Assuming this description was accurate, it would merely reinforce that this bogus fee should be included in the advertised monthly price for the service because those are basic costs of providing wireless service itself, and thus a reasonable consumer would expect those

costs to be included in the advertised price for the service.

18. Moreover, the administrative fee is not, in fact, tied to the costs that AT&T MOBILITY, LLC had.  This is corroborated by the fact that AT&T has repeatedly increased the amount of the monthly Administrative Fee since the fee was first imposed, while during that same time period the stated "costs" for (i.e., interconnect charges and cell site rental charges) have actually *decreased* according to AT&T's own financial statements and public filings with the Securities and Exchange Commission.

19. AT&T imposed and increased the Administrative Fee that it charged, not, as AT&T MOBILITY, LLC misleadingly stated in its buried description, in response to cell site rental and maintenance costs or interconnectivity costs, which AT&T MOBILITY, LLC's financial statements show have gone down at the same time AT&T MOBILITY, LLC has significantly increased the amount of the fee.

20. Such a deceptive practice is AT&T's misrepresentation of why a fee is being charged and where the money for the fee is being transferred to, if anywhere.  AT&T Mobility, LLC chose the descriptive terms and if they do not accurately describe what is being charged and collected, such conduct is actionable under the FDUTPA.

21. AT&T MOBILITY, LLC imposed and has increased the Administrative Fee as a covert way to increase customers' prices without having to advertise such an increase.  AT&T MOBILITY, LLC increased the Administrative Fee in large part to fund unrelated corporate liabilities of its parent company AT&T Inc., including to pay down the debt incurred in connection with the acquisition of Time Warner Inc. in 2018.

22. In all events, AT&T MOBILITY, LLC should clearly disclose the Administrative Fee and should clearly and accurately state the true monthly prices and applicable costs of AT&T

MOBILITY, LLC for its post-paid wireless service plans in its price representations and advertising.

23. Since the Administrative Fee was first introduced in 2013, AT&T MOBILITY, LLC has increased the amount of the fee three times, including twice over a three-month period in 2018. The current amount that AT&T MOBILITY, LLC charges all post-paid wireless customers for this fee is $1.99 per line every month, i.e., more than 200% more than the original amount of the fee.

24. AT&T MOBILITY, LLC has used this Administrative Fee scheme to improperly squeeze consumers for **hundreds of millions of dollars** in additional revenue without disclosing the actual "increased costs" in any financial filing available to any customer, including Plaintiff's assignor.

25. In essence, AT&T MOBILITY, LLC introduced the bogus Administrative Fee as a way to covertly increase the actual monthly price customers are charged for their service, and then has continued to use the Administrative Fee and unilateral increases thereto as a lever by which AT&T MOBILITY, LLC continues to ratchet up the price without the customer realizing and after the customer is already committed.

26. The Administrative Fee is part of a design to profit AT&T MOBILITY, LLC rather than pay for what it has determined is an increase in cost of AT&T MOBILITY, LLC. Thus, the practice of applying the administrative fee is unfair and deceptive.

27. This scheme has enabled, and continues to enable, AT&T MOBILITY, LLC to effectively increase its rates without having to publicly announce those prices and allows AT&T MOBILITY, LLC to entice more customers by misrepresenting the costs customers would pay both in absolute terms and relative to other wireless providers in the industry.

## COUNT I - DAMAGES UNDER THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

28.  Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through twenty-seven (27) above, and further alleges as follows:

29. Plaintiff's assignor, Pamela Kelly, at all material times, was a consumer, as defined under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), § 501.201, *et seq*., Fla. Stat.

30. AT&T MOBILITY, LLC, at all material times, was engaged in trade or commerce, as defined under the FDUTPA and is not otherwise exempt

31. In the advertising, sale, and renewal of mobile data and wireless plans and acceptance of payments, AT&T MOBILITY, LLC has represented, directly or indirectly, expressly or by implication, to customers that it would be charged a certain amount.  AT&T MOBILITY, LLC has since added an "Administrative Fee"  which is unfair and deceptive as it is not what its being used for. The administrative fee is a textbook pass through-fee. AT&T chose the descriptive terms of the administrative fee that does not accurately describe what is being charged and collected, such conduct is actionable under the FDUTPA.

32. Since the Administrative Fee was first imposed in 2013, AT&T MOBILITY, LLC has unilaterally increased the monthly amount of the fee three times. AT&T MOBILITY, LLC increased the Administrative Fee to $0.76 per month per phone line starting in June 2016. Then, in 2018, the increases because larger and more frequent (around the same time AT&T MOBILITY, LLC's parent company incurred significant debt in acquiring Time Warner Inc.).

33.          AT&T MOBILITY, LLC raised the Administrative Fee to $1.26 per month per phone line starting in April 2018, and then again to $1.99 per month per phone line starting

in June 2018, which is the current monthly fee as of this filing. Thus, between March 2018 and June 2018 alone, AT&T MOBILITY, LLC increased the Administrative Fee a whopping 162% increase in just three months.

34. AT&T MOBILITY, LLC's representation that the Administrative Fee is a charge assessed by AT&T MOBILITY, LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited to: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC customers to their customers; and (b) charges associated with cell site rents and maintenance is **false**. *__The administrative fee is instead a scheme to funnel direct profit to AT&T MOBILITY, LLC rather than pay for any identifiable increase in costs.__* AT&T MOBILITY, LLC knew or should have known that the representations regarding the administrative fee are false as AT&T MOBILITY, LLC's cost in interconnect charges a cell site charges actually decreased based on its own SEC federal filings.

35. AT&T MOBILITY, LLC knew that the monthly administrative fee was inflated, and not the result of good faith financial practices but instead designed to raise profit for the company without a specific actual change in price for services. Such a practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, including Plaintiff's assignor.

36. AT&T MOBILITY, LLC's knowingly unfair or deceptive trade practices of assessing and collecting a bogus administrative fee are the proximate cause of Plaintiff's assignor's actual damages. Plaintiff, standing in the shoes of its assignor, has suffered damages. AT&T MOBILITY, LLC's unfair and deceptive trade practice is not a result of a bona fide error or mistake but instead a conscious decision by AT&T MOBILITY, LLC.

37. Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services

    WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against Defendant for damages, interest, court costs, attorney's fees pursuant to § 501.2105, Florida Statutes, and any other relief the Court deems just and proper

## COUNT II – UNJUST ENRICHMENT

38. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through seven (7) above, and further alleges as follows:

39. Defendant assessed improper increased charges of $1.99/month administrative fee on Plaintiff's assignor's account. It is not a tax or charge which the government requires AT&T to collect from its customers. This charge is subject to change from time to time as AT&T's costs change which is improperly labeled. In June of 2018, Defendant increase its "administrative fee" to $1.99/per, per month with no specific reason or allegation that AT&T's costs had changed.

40. Defendant knew the monthly administrative fee was inflated and not the result of good faith financial practices and not actual costs of AT&T Mobility, LLC. Defendant had knowledge of payments by Plaintiff's assignor and voluntarily accepted and retained the benefit conferred on it.

41. Under the circumstances, it would be inequitable for Defendant to retain the benefit and thus as a result of the bogus administrative fee, Plaintiff's assignor suffered damages. Plaintiff, standing in the shoes of its assignor, has suffered damages.

42. Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services.

## COUNT III – NEGLIGENCE FOR DATA BREACH

43. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through twenty (27) as fully set forth herein

44. AT&T learned that a well-known threat actor claimed to be selling a database containing the personal information of over 70 million AT&T customers. This information included customers' names, addresses, phone numbers, Social Security numbers, and dates of birth. But instead of investigating the source and cause of the massive breach, AT&T denied the allegations, ignored the issue, and continued with operations. AT&T told one media outlet that "the information that appeared in an internet chat room does not appear to have come from our systems." And when questioned about its vendors, AT&T chose not to speculate: "Given this information did not come from us, we can't speculate on where it came from or whether it is valid." AT&T attempted to fully wash its hands of the disaster.

45. The same customer data is no longer just for sale; it has been fully exposed on the Dark Web. And after years of denial, AT&T has changed its tune. AT&T finally admitted that approximately 73 million former and current AT&T customers' personal and sensitive information was released onto the Dark Web (the "Data Breach"), including Plaintiff's Assignor'sinformation.

46. According to AT&T, customers' impacted information included a combination of their "full name, email address, mailing address, phone number, social security number, date of birth, and AT&T account number and passcode" (collectively, "PII"), which AT&T collected as a condition for use of its services. This recent revelation marks a concerning turn of events.

47. Equally troubling is that AT&T still appears clueless as to the source of the breach. One would hope that – in nearly three years – a telecom giant like AT&T would have conducted a "robust investigation" into the data leak to determine who was responsible, where the data originated from, which customers were impacted, how the Data Breach occurred, and other key factors. But it did not. Had it done so, the 73 million customers could have attempted to adequately protect themselves. Instead, AT&T remained willfully blind.

48. This Data Breach and resulting injuries occurred because AT&T failed to implement reasonable security procedures and practices (including failing to exercise appropriate managerial control over third-party partner's data security), failed to disclose material facts surround its deficient data security protocols, and failed to timely notify the victims of the Data Breach.

49. As a result of AT&T's failure to protect the PII it was entrusted to safeguard, Plaintiff now faces a significant risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

50. In connection with providing its wireless services, AT&T required Plaintiff to provide personal information, including but not limited to names, addresses, Social Security numbers, and dates of birth.

51. Given the amount and sensitive nature of the data it collects, AT&T maintains policies explaining its privacy practices handling consumers' personal information. Through these policies, AT&T represents to consumers and the public that it possesses robust security features to protect PII and it they their responsibility to protect PII seriously.

52. Given AT&T's avowed experience in its field handling highly sensitive personal

information, it understood the need to protect consumers' PII and prioritize data security.

53. AT&T admitted that its data security was breached and acknowledged the legitimacy of the leaked customer data:

> AT&T has determined that AT&T data-specific fields were contained in a data set released on the dark web approximately two weeks ago. While AT&T has made this determination, it is not yet known whether the data in those fields originated from AT&T or one of its vendors. With respect to the balance of the data set, which includes personal information such as social security numbers, the source of the data is still being assessed.
>
> AT&T has launched a robust investigation supported by internal and external cybersecurity experts. Based on our preliminary analysis, the data set appears to be from 2019 or earlier, impacting approximately 7.6 million current AT&T account holders and approximately 65.4 million former account holders.
>
> Currently, AT&T does not have evidence of unauthorized access to its systems resulting in exfiltration of the data set. The company is communicating proactively with those impacted and will be offering credit monitoring at our expense where applicable. We encourage current and former customers with questions to visit www.att.com/accountsafety for more information.
>
> As of today, this incident has not had a material impact on AT&T's operations.

54. AT&T had a duty to protect Plaintiff's Assignor's private information and has breached that duty.

55. But AT&T, like any company of its size that stores massive amounts of sensitive PII, should have had robust protections in place to detect and terminate a successful intrusion long before access and exposure of customer data. AT&T also should have exercised appropriate managerial control over their third-party partners' data security when it knew these partners stored its customers' PII in the course of carry out the business of their partnership. AT&T's failure to prevent the breach is inexcusable given its knowledge that

it and its affiliates are prime targets for cyberattacks.

56. In 2022, the National Security Agency (NSA), the Cybersecurity and Infrastructure Security Agency (CISA), and the Federal Bureau of Investigation (FBI) co-authored the joint Cybersecurity Advisory explicitly highlighting [t]elecommunications and network service provider targeting" by cyber actors. The Advisory explains how cyber actors exploit and access telecommunication organizations and network service providers though the use of open-source tools "that allows for the scanning of IP addresses for vulnerabilities." Once these cyber actors gain an initial foothold, they identify "critical users and infrastructure including systems critical to maintaining the security of authentication, authorization, and accounting."

57. Thus, whether the data breach occurred through AT&T's own systems or its third-party vendors, AT&T was responsible for the protection of Plaintiff's Assignor's PII.

58. And AT&T recognized these risks in its own regulatory filings with the SEC.

59. If not through its own history, AT&T surely understood the risk from its competitors. Considering recent high profile data breaches at other telecommunications companies, such as Xfinity (36,000,000 impacted, announced December 2023); T-Mobile (37,000,000 impacted, announced January 2023); and US-Cellular (52,000 impacted, announced March 2023), among others, AT&T knew or should have known that its data and consumers' PII would be, or had already been, targeted by cybercriminals.

60. To prevent unauthorized access, CISA encourages organizations to:

- Conduct regular vulnerability scanning to identify and address vulnerabilities, particularly on internet-facing devices;

- Regularly patch and update software to latest available versions,

prioritizing timely patching of internet-facing servers and software processing internet data;

- Ensure devices are properly configured and that security features are enabled;

- Employ best practices for use of Remote Desktop Protocol (RDP) as threat actors often gain initial access to a network through exposed and poorly secured remote services; and

- Disable operating system network file sharing protocol known as Server Message Block (SMB) which is used by threat actors to travel through a network to spread malware or access sensitive data.

61. The CISA guidance further recommends use of a centrally managed antivirus software utilizing automatic updates that will protect all devices connected to a network (as opposed to requiring separate software on each individual device), as well as implementing a real-time intrusion detection system that will detect potentially malicious network activity that occurs prior to ransomware deployment.

62. Consequently, AT&T knew of the importance of safeguarding PII and of the foreseeable consequences that would occur if their data security system was breached, including the significant costs that would be imposed on customers as a result of a breach.

63. But despite all of the publicly available knowledge of the continued compromises of PII and despite holding the PII of millions of customers, AT&T failed to use reasonable care in maintaining the privacy and security of the PII of Plaintiff.

64. Had AT&T implemented industry standard security measures, adequately invested in data security, and promptly investigated cybersecurity issues, unauthorized parties

likely would not have been able to access AT&T's or its third- party vendors' systems and the Data Breach would have been prevented or much smaller in scope.

65. The PII of consumers, including Plaintiff's, remains of high value to criminals, as evidenced by the continued sale and trade of such information on underground markets found on the "dark web"— which is a part of the internet that is intentionally hidden and inaccessible through standard web browsers

66. Data sets that include PII demand a much higher price on the black market. For example, the information likely exposed in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[25] The information likely disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

67. There is also an active and robust *legitimate* market for PII. In 2021, the data brokering industry alone was valued at $319 billion. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.  Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.

68. Because their PII has independent value, Plaintiffs must take measures to protect it including by, as AT&T's online notice instructs, placing "alerts" with credit reporting agencies, changing passcodes, and reviewing and monitoring credit reports and accounts for unauthorized activity, which may take years to discover and detect.

69. In connection with obtaining AT&T's services, Plaintiff was required to provide highly

sensitive personal information, such as his contact information, date of birth, Social Security number, and so on. AT&T also prompted Mr. Isbell to create login credentials to access his accounts.

70. In the regular course of business, AT&T shared Plaintiff's Assignor's information with several third-party partners whom AT&T was obligated to verify their data security practices because those third parties stored the information AT&T collected.

71. Plaintiff used the website "haveibeenpwned.com" to check if his PII had been part of the AT&T Data Breach. The website confirmed that Plaintiff was a victim of the Data Breach.

72. Because AT&T continues to store and share  PII in the regular course of its business, Plaintiff has a continuing interest in ensuring that the PII is protected and safeguarded from additional authorized access.

73. Federal agencies have issued recommendations and guidelines to help minimize the risks of a data breach for businesses holding sensitive data. For example, the Federal Trade Commission (FTC) has issued numerous guides for businesses highlighting the importance of reasonable data security practices, which should be factored into all business-related decision making.

74. The FTC's publication Protecting Personal Information: A Guide for Business sets forth fundamental data security principles and practices for businesses to implement and follow as a means to protect sensitive data.

75. Among other things, the guidelines note that businesses should (a) protect the personal customer information that they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their

computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems. The FTC guidelines further recommend that businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large amounts of data being transmitted from their system, and have a response plan ready in the event of a breach.

76. Additionally, the FTC recommends that organizations limit access to sensitive data, require complex passwords to be used on networks, use industry- tested methods for security; monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

77. The FTC has brought enforcement actions against businesses for failing to reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

78. AT&T was fully aware of its obligation to implement and use reasonable measures to protect customers' PII but failed to comply with these basic recommendations and guidelines that would have prevented this breach from occurring. AT&T's failure to employ reasonable measures to protect against unauthorized access to customer information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

79. Though limited detail is available on the Data Breach, how it occurred or the entity the information originated from, AT&T's failure to safeguard customers' PII suggests

AT&T failed to fully comply with industry-standard cybersecurity practices, including, but not limited to, proper firewall configuration, network segmentation, secure credential storage, user-activity monitoring, data-loss prevention, encryption, intrusion detection and prevention, and exercising managerial control over third-party vendors' cybersecurity practices.

80. AT&T's failure to keep Plaintiff's Assignor's PII secure has severe ramifications. Given the sensitive nature of the PII stolen in the Data Breach—names, date of birth, Social Security numbers, and potentially other sensitive information—hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff's assignor now and into the indefinite future

81. As a result, Plaintiff's assignor has suffered injury including identity theft and related cybercrimes due to the Data Breach. Indeed, Plaintiff's PII has already been published to the Dark Web available for any cybercriminal to misuse.

82. As discussed above, the PII likely exposed in the Data Breach is highly coveted and valuable on underground markets as it can be used to commit identity theft and fraud. Malicious actors use PII to, among other things, gain access to consumers' bank accounts, social media, and credit cards. Malicious actors can also use PII to open new financial accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government IDs, or create "synthetic identities.

83. Further, malicious actors may wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These actors will also re-use stolen PII,

meaning individuals can be the victims of several cybercrimes stemming from a single data breach.

84. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. According to the Government Accountability Office, which conducted a study regarding data breaches: "law enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm. The unauthorized disclosure of the sensitive PII to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.

85. Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense. And here, Plaintiff's PII is already available to criminal actors on the dark web.

86. As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff's assignor has and will continue to suffer harm for which it is entitled to

damages, including, but not limited to, the following the unconsented disclosure of confidential information to a third party;

- losing the value of the explicit and implicit promises of data security;
- identity theft and fraud resulting from the theft of their PII;
- costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;
- costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;
- unauthorized charges and loss of use of and access to their financial and investment account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;
- lowered credit scores resulting from credit inquiries following fraudulent activities;
- costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and
- the continued, imminent, and certainly impending injury flowing from potential fraud and identify theft posed by their PII being in the possession of one or many unauthorized third parties.

87. Plaintiff's assignor has a direct interest in AT&T's promises and duties to protect its PII, *i.e.,* that AT&T *not increase* their risk of identity theft and fraud. Because AT&T failed to live up to its promises and duties in this respect, Plaintiff's assignor seeks the present value of identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by AT&T's wrongful conduct.

88. Through this remedy, Plaintiff's assignor seeks to restore close to the same position as they would have occupied but for AT&T's wrongful conduct, namely their failure to adequately protect Plaintiff's PII. Plaintiff further seeks to recover the value of the unauthorized access to their PII permitted through AT&T's wrongful conduct. This

measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology.

89. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP— *i.e.,* a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non- practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff has a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

90. Defendant AT&T required Plaintiff's assignor's PII as a condition to receiving AT&T's services. AT&T collected and stored this PII for commercial gain. AT&T collected, stored, and through the its partnership with third- party vendors, shared the data with these vendors for providing AT&T's services as well as commercial gain.

91. AT&T owed a duty of care to Plaintiff's assignor to provide adequate data security, consistent with industry standards, to ensure that AT&T's and its vendors' systems and networks adequately protected the PII

92. AT&T owed a duty of care to Plaintiff's assignor so as to alleviate the risk of

compromising Plaintiff's PII.

93. AT&T duty to use reasonable care in protecting PII arises because of the parties' relationship, as well as common law and federal law, including the FTC regulations described above and AT&T's own policies and promises regarding privacy and data security.

94. AT&T knew, or should have known, of the risks inherent in collecting and storing PII in a centralized location for the purpose of carrying out the business of the partnership, its vendors' vulnerability to network attacks, and the importance of adequate security.

95. AT&T breached its duty to Plaintiff in numerous ways, as described herein, including by:

- Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the PII of Plaintiff's assignor;

- Failing to ensure its vendors implemented adequate security systems, protocols, and practices sufficient to protect the PII of Plaintiff's assignor;

- Failing to supervise its vendors regarding vendors' data security systems, protocols, and practices when it knew or should have known those systems, protocols, and practices were inadequate;

- Failing to comply with industry standard data security measures for the telecommunications industry leading up to the Data Breach;

- Failing to comply with its own privacy policies;

- Failing to comply with regulations protecting the PII at issue during the period of the Data Breach;

- Failing to adequately monitor, evaluate, and ensure the security of their vendors'

network and systems;

- Failing to recognize in a timely manner that PII had been compromised; and

- Failing to timely and adequately disclose the Data Breach.

96. Plaintiff's PII would not have been compromised but for AT&T's wrongful and negligent breach of its duties

97. AT&T's failure to take proper security measures to protect the sensitive PII of Plaintiff's assignor as described herein, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access, copying, and exfiltrating of PII by unauthorized third parties. Given that telecommunications businesses are prime targets for hackers, Plaintiff are part of a foreseeable, discernible group that was at high risk of having its PII misused or disclosed if not adequately protected by AT&T.

98. It was also foreseeable that AT&T's failure to provide timely and forthright notice of the Data Breach would result in injury to Plaintiff's assignor.

99. As a direct and proximate result of AT&T's conduct, Plaintiff's assignor has and will suffer damages including: (i) the loss of rental or use value of their PII; (ii) the unconsented disclosure of their PII to unauthorized third parties; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) the continued risk to their PII, which remains in AT&T's possession and is subject to further unauthorized

disclosures so long as AT&T fails to undertake appropriate and adequate measures to protect it; (vii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII; and (ix) any nominal damages that may be awarded.

100.    Plaintiff stands in the shoes of its assignor and assumes all rights to recover against AT&T.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T and any other relief the Court deems just and proper including attorney's fees and costs pursuant to Sec. 501.2015, Fla. Stat..

## COUNT IV-VIOLATION OF FDUTPA FOR DATA BREACH

101.    Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through twenty-seven (27) above and further alleges as follows:

102.    Defendant engaged in unfair or deceptive acts or practices in the conduct of consumer transactions in violation of FDUTPA, including but not limited to:

   a.  Representing that its services were of a particular standard or quality that it knew or should have known were of another;

   b.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's Assignor's Sensitive Information, which was a direct and proximate cause of the Data Breach;

   c.  Failing to identify foreseeable security and privacy risks, and remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

   d.  Failing to comply with common law and statutory duties pertaining to the

security and privacy of Plaintiff's Assignor's Sensitive Information, including duties imposed by the FTCA, 15 U.S.C. § 45, which was a direct and proximate cause of the Cyber-Attack and data breach;

e. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's Assignor's Sensitive Information, including by implementing and maintaining reasonable security measures;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's Assignor's Sensitive Information; and

g. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's Assignor's Personal Information, including duties imposed by the FTCA, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach.

103.    Defendant's representations and omissions were material because it was likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' Sensitive Information.

104.    In addition, Defendant's failure to secure consumers' PHI violated the FTCA and therefore violated FDUTPA.

105.    Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the Sensitive Information of Plaintiff's assignor, deter hackers, and detect a breach within a reasonable time, and that the risk of a data breach was highly likely.

106.     The aforesaid conduct constitutes a violation of FDUTPA, Fla. Stat. § 501.204, in that it is a restraint on trade or commerce.

107.     Defendant's implied and express representations that it would adequately safeguard Plaintiff's Assignor's Sensitive Information constitute representations as to characteristics, uses or benefits of services that such services did not actually have, in violation of Fla. Stat. § 501.202(2).

108.     Most, if not all, of the alleged misrepresentations and omissions by AT&T complained of herein that led to inadequate safety measures to protect patient information occurred within or were approved within Florida.

109.     AT&T's implied and express representations that it would adequately safeguard Plaintiff's Assignor's Sensitive Information constitute representations as to the particular standard, quality, or grade of services that such services did not actually have (as the data security services were of another, inferior quality), in violation of Fla. Stat. § 501.204.

110.     AT&T knowingly made false or misleading statements in its privacy policy regarding the use of personal information submitted by members of the public in that Defendant advertised it is committed to protecting privacy and securely maintaining personal information. Defendant did not securely maintain personal information as represented, in violation of Fla. Stat. § 501.171.

111.      These violations have caused actual damages to Plaintiff's assignor.

112.     Plaintiff, as assignee, brings this action under the Deceptive and Unfair Trade Practices Act to seek such her actual damages incurred for violations and to recover costs of this action, including reasonable attorneys' fees and costs.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T for damages, interest, court costs, attorney's fees, and any other relief the Court deems just and proper.

### CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was sent via e-portal this November 19, 2024 to: Manuel A. Garcia-Linares, Esquire (mgarcialinares@daypitney.com, edavila@daypitney.com) Andrew R. Ingalls, Esquire (aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower - 14th Floor, Miami, Florida 33134.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Drive, Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:     /s/ *Maury L. Udell*
Maury L. Udell, Esquire
mudell@bmulaw.com
Fla. Bar 121673